NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250573-U

NO. 4-25-0573

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 3, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| JASON L. JACKSON, | ) | No. 01CF1211 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Grischow concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) Defendant failed to show the circuit court erred during the second stage of postconviction proceedings in dismissing his claims that his (i) defense counsel was ineffective for failing to offer to stipulate to the mere fact of his prior felony conviction at trial and (ii) appellate counsel was ineffective for failing to raise that issue on direct appeal.

(2) Defendant established that the circuit court erred in its dismissal of his actual innocence claim at the second stage of postconviction proceedings, and defendant is entitled to a third-stage evidentiary hearing as to that claim.

¶ 2     Defendant, Jason L. Jackson, appeals from the circuit court's second-stage dismissal of his amended postconviction petition. He argues his petition made a substantial showing of constitutional violations based on claims of ineffective assistance of counsel and actual innocence. We affirm in part, reverse in part, and remand with directions.

¶ 3     I. BACKGROUND

¶ 4     A. Trial Proceedings and Direct Appeal

¶ 5　　　　In January 2002, defendant was charged by indictment with attempted first degree murder (720 ILCS 5/8-4(a), 9-1 (2000)) (count I), aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)) (count II), two counts of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)) (counts III and IV), and residential burglary (*id.* § 19-3(a)) (count V). The charges were based, in part, on allegations that defendant possessed and discharged a firearm at a police officer and that he had previously been convicted of a felony, armed robbery, and was on parole or supervised release at the time of the charged offenses. In October 2002, defendant's jury trial was conducted. The record shows the circuit court dismissed defendant's residential burglary charge on the State's motion and the jury found defendant guilty of the remaining charged offenses.

¶ 6　　　　At trial, the State's theory of the case was that defendant and an individual named Paul Green went to a residence in Peoria, Illinois, to commit a robbery and, in fleeing the scene, defendant fired a gun at a police officer. Defendant's theory was that Green possessed the gun and fired it while running from the police.

¶ 7　　　　Evidence at defendant's trial showed that at approximately 11:45 p.m. on December 14, 2001, City of Peoria police officer David Buchanan was dispatched to a residence in response to a call about a possible burglary in progress. Upon arriving at the scene, he "saw two subjects running from the backyard area" of the residence in question. He pursued the subjects on foot, who ran across an empty lot toward a hill. Buchanan identified himself as a police officer and ordered the subjects to stop.

¶ 8　　　　According to Buchanan, it was "very dark" out and hard to see. He described the "first suspect" as having a large build and wearing all dark clothing. The "second suspect" was thinner than the first, wore a dark jacket with "lighter colored writing," and appeared to run with a limp. Buchanan testified that as he chased the suspects, the first suspect was approximately 75

feet in front of him, and the second suspect was approximately 50 feet in front of him.

¶ 9        Buchanan saw one of the subjects appear to turn his upper body. He then "heard a gunshot and saw [a] muzzle flash." From the muzzle flash, he believed the subject was firing a gun that "was leveled right at [him]," but he was not hit. At the time of the incident, Buchanan believed that the suspect who was closest to him was the one who fired the shot. However, at the time of the trial, he indicated that it could have been either of the two suspects he was chasing that fired a gun at him.

¶ 10        Buchanan stated he drew his own weapon and "kept [his] eyes on the person that fired the shot." He fired his gun three times and saw the subject fall at the bottom of the hill near a chain link fence. Buchanan believed the person fell because he had been "hit." As Buchanan approached, he observed the subject continuing to move up the hill. Buchanan testified he reached the fence but did not immediately climb it because he could still see the person that he believed had fired the gun going up the hill. After advising dispatch over his radio that shots had been fired, Buchanan climbed the fence and went to the top of the hill. There, he observed City of Peoria police officer Christy Tindall ordering a person to the ground at gunpoint. Because the person did not "get clear down to his belly" as ordered, Buchanan "jumped on top of him and handcuffed him." He identified that person as defendant.

¶ 11        Tindall testified that upon her arrival at the scene, she saw Buchanan running and "took off running" as well. She heard Buchanan yell, "[S]top, police." Tindall estimated that she was 15 or 20 feet behind Buchanan when she heard a gunshot and "felt the sudden burst of air or pressure go past [her] right shoulder." She then saw Buchanan fire three shots. Tindall stated she observed a Black male standing by a tree and that she "saw him go down" after Buchanan fired his weapon. She testified she did not see the male holding a gun, noting that it was "very dark."

She also did not know whether the male she saw was defendant.

¶ 12 After the male went "down," Tindall stated he got back up and ran between some houses. Tindall and Buchanan ran in the same direction but lost sight of him. A couple of minutes later, as Tindall was searching the area with other officers, a subject came walking out from between two houses next to where Tindall thought the male "had ran through." Tindall ordered the subject, whom she identified as defendant, to the ground, and he was taken into custody.

¶ 13 When asked whether she saw "[t]he other person that was being chased," Tindall stated she "saw a shadow of a person up in the yards" when the subject that Buchanan was shooting at fell. She also testified that no one other than defendant was caught in the area.

¶ 14 After defendant was arrested and taken to the Peoria Police Department, a police officer noticed a wound on his back. Defendant was taken to the hospital and treated for a two-centimeter laceration on his head and a five-to-six-centimeter laceration on his left shoulder. Defendant reported that his left shoulder laceration was "caused by glass"; however, the emergency room doctor who treated him opined the injury was more consistent with a gunshot wound.

¶ 15 Police officer Eric Ellis testified he examined defendant's clothing, which included a T-shirt and two sweatshirts. He observed holes in each item of clothing that from his experience "resembled projectile holes within clothing." Each article of clothing had two holes, one that was oval shaped and had the appearance of an "entrance" defect and a second that was circular and appeared to be an "exit" defect. Ellis further observed "blood around the defect in the left shoulder area" of the T-shirt.

¶ 16 The State's evidence further showed that gunshot residue was found on the right cuff of the outer sweatshirt defendant was wearing at the time of the alleged offenses. Robert Berk,

a forensic scientist with the Illinois State Police, who tested defendant's clothing for gunshot residue, opined that the test results indicated that the cuff of the sweatshirt "had either been in the environment of gunshot residue when a weapon was discharged or ha[d] come in contact with an item that ha[d] gunshot residue on it." Regarding why he tested the cuffs of the clothing for gunshot residue, Berk stated as follows:

> "[I]f an individual is wearing a garment and discharges a weapon, two clouds of smoke are emitted, one cloud of smoke that travels down range away from them, a second cloud of smoke that comes back across their hand, and if they're wearing a long-sleeve garment, would also come in contact with the garment at that point, so if I'm testing a long-sleeve garment for gunshot residue, it's this area of the clothing that I sample in an effort to detect it."

Although Berk acknowledged that he could not say with certainty that the person wearing the sweatshirt had fired a gun, he stated his findings were consistent with someone holding a weapon and firing it from their right hand.

¶ 17        Hours after the shooting incident, the police located a vehicle that Green had borrowed from an acquaintance on December 14, 2001. Inside the vehicle was a dark-colored jacket with light writing that spelled "Phat Farm." The jacket was not tested for gunshot residue.

¶ 18        On the morning of December 15, 2001, police officers returned to the scene of the incident to look for evidence, including cartridge cases. They found a revolver on the rooftop of a house in the area where defendant was apprehended. Upon examination, the police discovered one spent cartridge case in the cylinder of the revolver. No identifiable fingerprints were found on the weapon.

¶ 19        Detective Michael Mushinsky testified that he and another detective interviewed

defendant twice on the day after the shooting incident. During their first interview, which occurred at approximately 4 a.m., defendant denied any involvement in the shooting. He reported that around 5 p.m., prior to the shooting, he and Green had gone to the home of Michael Catton to buy marijuana. Later, defendant and Green realized that Catton had shorted them $400 worth of marijuana, and they returned to Catton's home to get either more marijuana or their $400. Defendant maintained that Green had a gun wrapped in a towel and that Catton locked himself in a bedroom and told them he had called the police. According to defendant, he and Green ran outside, and Green fired a shot at the police officers who had arrived at the scene. Defendant stated he then heard numerous shots being fired behind him.

¶ 20 The second interview occurred around 10 p.m. the same day. Mushinsky stated defendant immediately apologized for lying during their earlier conversation and stated he was sure that the police had gotten his fingerprints off the gun and found gunshot residue on the sleeve of his shirt. After Mushinsky asked defendant to tell the detectives the "whole story," defendant indicated that he and Green had gone to Catton's home to commit a robbery. Catton denied having money but stated he had a gun with two rounds in it that defendant could have. Following an altercation inside the residence, Catton called 911, and defendant and Green went out the back door. Defendant heard the police yell for them to stop and to get down on the ground. While running, defendant attempted to pull a gun out of his pocket to get rid of it. However, he ran into a fence, and the gun went off. Defendant stated he started going over the fence and "heard several rounds behind him." He felt one of the rounds hit him in the shoulder and he fell. Defendant stated he got back up and ran through some yards. He threw the gun on the roof of a house before being apprehended by the police. According to Mushinsky, defendant also identified a photograph of the revolver found by the police as the one he had in his possession.

¶ 21 Mushinsky testified that after the second interview, he asked defendant to provide a videotaped statement, but defendant refused. He also described defendant as being "bulkier" in size than Green.

¶ 22 Terry Talbert testified he was a parole agent for the Illinois Department of Corrections. In August 2001, he began supervising defendant, who had recently been released from prison and was on mandatory supervised release for an armed robbery conviction. Following Talbert's testimony, the circuit court provided the following instruction to the jury: "Ladies and gentlemen, the jury is instructed that the testimony just admitted is for the limited purpose, and the limited purpose relates to the elements in Counts 3 and 4 only of the indictment and should be considered by you for no other purpose."

¶ 23 Defendant testified on his own behalf. He acknowledged that late in the evening of December 14, 2001, he was with Green and they encountered the police after "running" from Catton's residence. Although defendant heard the police yell for him to stop, he "continued to run." He stated he was in front of Green as they ran across the field. As defendant was climbing over a fence, he heard a single gunshot and felt something "graze[ ]" his back. Defendant stated he continued to climb the fence and run and heard three more shots. He ran through someone's backyard, was scared, and tried to hide from the police under a vehicle. Defendant stated he ultimately left his hiding spot and surrendered to the police. Defendant denied that he had a gun in his possession or that he fired a gun during the incident. Additionally, he testified that earlier on the day of the incident and in the days before, he saw Green with a gun.

¶ 24 Defendant also denied making some of the statements attributed to him by Detective Mushinsky during their second interview. In particular, he denied telling Mushinsky that he had possessed or fired a gun during his encounter with the police, received a gun from Catton,

entered Catton's residence before encountering the police, or intended to rob Catton. Defendant maintained, instead, that he had continued to deny possessing or shooting a gun during that second interview. Additionally, defendant testified that it was his belief that Green shot him during the December 14, 2001, incident and not the police.

¶ 25    In December 2002, the circuit court entered judgments of conviction for the attempted murder charge and one count of unlawful possession of a weapon by a felon and sentenced defendant to concurrent sentences of 38 years and 7 years in prison, respectively. Defendant appealed, challenging the sufficiency of the evidence against him and arguing he was denied a fair trial by comments the prosecutor made during closing arguments. *People v. Jackson*, 3-02-0986 (2004) (unpublished order under Illinois Supreme Court Rule 23). The Third District affirmed. *Id.*

¶ 26                    B. Proceedings Following Defendant's

Original Postconviction Petition

¶ 27    In March 2005, defendant filed a *pro se* postconviction petition, raising claims of ineffective assistance of counsel and actual innocence. With respect to his actual innocence claim, defendant alleged he could present newly discovered evidence in the form of statements from an individual named Karl Nelms. He attached Nelms's affidavit, dated March 6, 2003, to his filing, in which Nelms averred that (1) on December 14, 2001, he saw Green "in possession of a chrome gun;" (2) on December 14, 2001, defendant did not have a gun; (3) on December 14, 2001, he observed Green wearing a black jacket with the words "Phat Farm" in light blue lettering; (4) he knew Green "to have leg injuries and walk with a limp;" (5) Green was 80 pounds lighter than defendant; (6) on the night of December 14, 2001, Green wore gloves; and (7) Green told him that his gun accidentally went off and he got rid of it.

¶ 28       In April 2005, the circuit court entered a written order dismissing defendant's postconviction petition on the basis that it was frivolous and patently without merit. Defendant appealed and, on review, the Third District reversed and remanded for further postconviction proceedings. *People v. Jackson*, 3-05-0301 (2007) (unpublished order under Illinois Supreme Court Rule 23) (Holdridge, J., specially concurring; Schmidt, J., dissenting). The reviewing court found Nelms's affidavit qualified as newly discovered evidence and was corroborative of defendant's testimony rather than cumulative of the other evidence presented at trial. *Id.* The order included a finding that Nelms's testimony at an evidentiary hearing could result in a finding of actual innocence and further stated as follows:

> "Defendant has satisfied each criteria to proceed to an evidentiary hearing on his post-conviction petition. ***
>
> For the foregoing reasons, we find that the petition makes a substantial showing that defendant's constitutional rights had been violated in that defendant did not fire at Buchanan and he [was] innocent of the offense for which he [stood] convicted. The petition is sufficient to state the gist of a constitutional claim of actual innocence and defendant is entitled to an evidentiary hearing thereon." *Id.*

¶ 29       Notably, one justice specially concurred, writing separately to emphasize that the reviewing court's decision did not turn on the substantive merits of defendant's petition. Instead, defendant was simply entitled to second-stage postconviction proceedings, *i.e.*, the appointment of counsel to amend and argue his petition because it stated the gist of a meritorious claim. *Id.* The third justice dissented, finding the claims in defendant's petition were positively rebutted by the record. *Id.*

¶ 30       On remand in September 2007, the circuit court appointed counsel for defendant

and docketed the matter for further postconviction proceedings. Over the next several years, different public defenders were assigned to defendant's case, and the matter was continued several times. At a November 2013 hearing, both defendant's counsel and the State agreed that the matter had been remanded for a third-stage evidentiary hearing on defendant's actual innocence claim and that second-stage postconviction proceedings were unnecessary. At the next hearing date, defendant informed the court that he disagreed that his case had been remanded solely for an evidentiary hearing on his actual innocence claim and expressed concern that the remainder of his postconviction issues would be waived. Thereafter, defendant's counsel was granted several continuances as he attempted to locate Nelms.

¶ 31　　　　　In March 2015, defendant's counsel informed the circuit court that he was still unable to locate Nelms. At the same hearing, defendant asked to proceed *pro se*, and the court granted his request.

¶ 32　　　　　In May 2015, the circuit court conducted a third-stage evidentiary hearing on defendant's petition. The court noted there was "some dispute" as to what postconviction issues survived on remand. It stated it had reviewed the Third District's prior decision and "reached the conclusion that the only issue that the Third District remanded on was the claim of actual innocence." Nelms did not testify at the hearing and defendant presented only argument. In June 2015, the court entered a written order denying defendant's petition. In July 2015, defendant filed a *pro se* motion for reconsideration of the court's ruling.

¶ 33　　　　　In February 2016, defendant moved for leave to file a successive postconviction petition, which the circuit court granted. In June 2016, he filed his successive postconviction petition, which raised a claim of actual innocence. Defendant's claim was based on the allegedly newly discovered affidavit of Davett Fisher, which was dated January 5, 2016, and attached to his

filing. In the affidavit, Fisher asserted that sometime in December 2001, around midnight, he was sitting in his car in the area where the charged offenses occurred and was intending "to buy some weed." He observed "two guys" running from the back of the house where he had intended to go. Fisher recognized one of the men as "BD Paul." He saw "BD Paul" slip and stumble, heard a discharge from a gun, and "noticed the flash of the gunshot in Paul['s] hand." Fisher averred that he also saw a police officer, who was pursuing the two men, shoot his weapon several times at the men.

¶ 34        Fisher's affidavit further stated that in September 2015, he met defendant while in prison. Because they were both from Peoria, they discussed people they knew, and defendant asked if Fisher knew "BD Paul." Fisher stated he did and described the incident he witnessed "where the police was shooting at Paul." Additionally, he indicated he did not see the "other male" who was involved in the incident "with any weapon."

¶ 35        Defendant's successive petition was advanced to the second stage of postconviction proceedings, and the State filed a motion to dismiss. In March 2017, the circuit court entered a written order denying both defendant's successive postconviction petition and his motion to reconsider the denial of his initial postconviction petition. Defendant appealed.

¶ 36        On review, the Third District determined that its prior order had been misinterpreted and, as a result, defendant's postconviction counsel had failed to comply with the required duties for postconviction counsel set forth in Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013). *People v. Jackson*, 2019 IL App (3d) 170213-U, ¶ 25. Regarding its prior decision, the court stated as follows:

> "We acknowledge that our prior order remanding the matter for further postconviction proceedings was subject to some fair but conflicting interpretations

- 11 -

of our intent. With the benefit of hindsight, it appears our prior order remanded the matter generally for second-stage proceedings rather than an evidentiary hearing on only one issue at the third-stage level. Any other interpretation would not result in a consensus on the remedy since the only concurring justice wrote separately to clarify that the matter was being remanded for second-stage proceedings." *Id.* ¶ 26. The court vacated the circuit court's orders denying defendant's initial postconviction petition, granting defendant leave to file a successive petition, and denying his successive petition and remanded for the appointment of new counsel and new second-stage proceedings on defendant's initial postconviction petition. *Id.* ¶ 30.

¶ 37          On remand, the circuit court appointed counsel for defendant and set the matter for second-stage review. In June 2020, the State filed a motion to dismiss both defendant's original and successive postconviction petitions. Although defendant's counsel did not file any amended pleading, in December 2020, defendant *pro se* filed an amended petition. He raised several ineffective-assistance-of-counsel claims and a claim of actual innocence based on Fisher's affidavit. Defendant did not include any claims related to Nelms in his amended petition and failed to attach Fisher's affidavit to his filing.

¶ 38          In June 2021, the circuit court conducted a hearing on the State's motion to dismiss. Relevant to this appeal, the State argued claims relating to Nelms's affidavit were *res judicata* and Fisher's affidavit was cumulative of other evidence and not compelling. Defendant's counsel argued that both Nelms's affidavit and Fisher's affidavit warranted a third-stage evidentiary hearing. In July 2021, the court entered a written order, finding the State's arguments were well taken and dismissing defendant's "pending postconviction petition and any amendment thereto."

¶ 39          Again, defendant appealed. On review, the Third District found the circuit court did

not follow its prior mandate by failing to ensure that defendant received a full and fair second-stage proceeding with the benefit of counsel. *People v. Jackson*, 2023 IL App (3d) 210372-U, ¶ 23. In particular, it noted that defendant's postconviction counsel did not file an amended postconviction petition, as was suggested in the reviewing court's previous order, and that, at the second-stage hearing, counsel presented argument on claims that were raised in both defendant's original postconviction petition and in his December 2020 *pro se* amended petition. *Id.* ¶ 21. The court vacated the circuit court's dismissal of defendant's postconviction petition and remanded for new second-stage proceedings. *Id.* ¶ 23. The reviewing court also directed the court to appoint new postconviction counsel for defendant and directed that new counsel should file one operative pleading that included "all viable claims from the initial and amended petition." *Id.* Finally, the reviewing court directed the circuit court to consider "all claims in the postconviction petition as amended, no matter if they [had] already received a hearing." *Id.*

¶ 40        C. The Amended Postconviction Petition at Issue on Appeal

¶ 41        On remand, new counsel was appointed for defendant and, in September 2024, counsel filed an amended postconviction petition on defendant's behalf. Relevant to this appeal, defendant's amended petition raised an ineffective assistance of counsel claim based on trial counsel's failure to stipulate at trial to the mere fact of defendant's prior felony conviction. It also included an actual innocence claim based on the affidavits of both Nelms and Fisher.

¶ 42        With respect to his ineffective assistance claim, defendant argued his trial counsel actively introduced evidence as to the substance of his prior felony conviction at trial rather than simply stipulate to the mere fact of that prior conviction. He asserted no reasonable trial strategy existed for introducing the details of his criminal record. Defendant further argued that counsel's decision prejudiced him by both "impairing his personal right to decide whether or not to testify"

and "over-emphasizing the substance of [his] earlier conviction for armed robbery." He maintained a substantial likelihood existed that he would have been acquitted at trial if not for his counsel's unreasonable action. Defendant also argued that his appellate counsel was ineffective for failing to raise the issue on direct appeal.

¶ 43　　Regarding his actual innocence claim, defendant argued Nelms and Fisher were witnesses who could corroborate his trial testimony that Green was the person who possessed and fired a gun during the December 14, 2001, encounter with the police. He maintained that testimony from Nelms and Fisher constituted new, material, noncumulative evidence that was of such conclusive character so as to probably change the result of a new trial. Both Nelms's March 2003 affidavit and Fisher's January 2016 affidavit were attached to defendant's amended petition.

¶ 44　　In December 2024, the State filed an amended motion to dismiss defendant's petition. It argued strategic reasons existed for counsel not to stipulate to the mere fact of defendant's prior conviction, including that a jury might assume a defendant "was convicted of something worse than he was." Further, it pointed out that defendant cited no case authority that required trial counsel to offer to stipulate to the mere fact of a prior conviction and asserted that, "given the overall evidence admitted at trial," defendant could not show prejudice. With respect to defendant's actual innocence claim, the State argued that neither witness's affidavit was of such a conclusive character that it would change the result of defendant's trial. It asserted Nelms's affidavit was based on hearsay and that the content of both affidavits was "contradicted by the uncontested evidence" at trial.

¶ 45　　In March 2025, the circuit court conducted a second-stage hearing. It heard arguments from the parties and took the matter under advisement. In May 2025, it entered a written order granting the State's motion to dismiss and dismissing defendant's amended postconviction

petition. The court determined that defendant's petition failed to "show[ ] a substantial denial of [a] constitutional right," in that his petition failed to address constitutional issues, dealt with matters that were previously resolved in prior appellate opinions, or concerned matters that were completely rebutted by the record.

¶ 46    This appeal followed.

¶ 47                                    II. ANALYSIS

¶ 48    On appeal, defendant argues the circuit court erred in its second-stage dismissal of his amended postconviction petition. He contends his amended petition made more than a substantial showing that his trial counsel was ineffective for not stipulating to the mere fact of his prior felony conviction, requiring reversal and either remand for a new trial or a third-stage evidentiary hearing. Defendant also argues he was entitled to a third-stage evidentiary hearing on his actual innocence claim because he presented the affidavits of two new witnesses who could provide testimony that contradicted the State's evidence that he was the shooter.

¶ 49                            A. Postconviction Proceedings

¶ 50    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2024)) sets forth a three-stage process pursuant to which a criminal defendant may assert that his or her conviction resulted from the substantial denial of a constitutional right. *People v. Agee*, 2023 IL 128413, ¶ 36. "At the first stage, the circuit court has 90 days to review a petition and may summarily dismiss it if the court finds it is frivolous and patently without merit." *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). If the petition is not dismissed within 90 days, it moves to the second stage, where the court may appoint counsel for an indigent defendant, appointed counsel may amend the defendant's petition, and the State may file a responsive pleading. *People v. Cotto*, 2016 IL 119006, ¶ 27.

- 15 -

¶ 51        At the second stage, "the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." (Internal quotation marks omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 33.

> "The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle [the] petitioner to relief." (Emphasis omitted.) *Id.* ¶ 35.

Second-stage proceedings do not require the court to engage in fact finding or make credibility determinations. *Id.* (citing *People v. Coleman*, 183 Ill. 2d 366, 385 (1998)).

¶ 52        When the defendant makes a substantial showing of a constitutional violation at the second stage, he or she is entitled to a third-stage evidentiary hearing. *Id.* ¶ 34. The second-stage dismissal of a postconviction petition is subject to *de novo* review. *People v. Dupree*, 2018 IL 122307, ¶ 29.

¶ 53                        B. Ineffective Assistance of Counsel

¶ 54        As stated, defendant initially contends that his amended postconviction petition established that he received ineffective assistance of counsel based on his trial counsel's failure to stipulate to the mere fact of his prior felony conviction, which resulted in the jury hearing evidence that he had previously been convicted of armed robbery. Defendant argues his counsel performed deficiently by failing to offer to stipulate to the mere fact of his felon status when the circuit court

would have been obligated to accept his stipulation. He further maintains he was prejudiced by his counsel's performance because the evidence presented at trial regarding whether he had fired a gun was closely balanced. Defendant also contends his appellate counsel was ineffective for failing to raise the issue on direct appeal.

¶ 55        Ineffective-assistance-of-counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Roland*, 2023 IL 128366, ¶ 26. Under that standard, a defendant must show both that (1) his counsel's performance was deficient, *i.e.*, "objectively unreasonable under prevailing professional norms" and (2) he suffered prejudice, *i.e.*, "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* On review, we may dispose of an ineffective assistance claim based on *Strickland*'s prejudice prong without determining whether counsel's performance was deficient. *People v. Johnson*, 2021 IL 126291, ¶ 53 ("If it is easier to dispose of an ineffective-assistance claim on the ground that it lacks a showing of sufficient prejudice, a court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient.").

¶ 56        The *Strickland* standard similarly applies to claims of ineffective assistance of appellate counsel. *People v. Johnson*, 205 Ill. 2d 381, 405 (2002). "A defendant who claims that appellate counsel was ineffective must show that the failure to raise an issue on appeal was objectively unreasonable and this decision prejudiced the defendant." *Id.* at 405-06. Appellate counsel is not required to raise nonmeritorious issues. *Id.* at 406 (stating a defendant claiming ineffective assistance of appellate counsel suffers "no prejudice unless the underlying issue is meritorious").

¶ 57        Initially, we note the State argues that defendant has forfeited his ineffective assistance claim as it relates to his appellate counsel. It contends defendant presented no meaningful analysis of that claim in his appellant's brief. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ( providing that the argument section of an appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and that "[p]oints not argued are forfeited").

¶ 58        Here, there is no dispute that defendant alleged the ineffectiveness of his appellate counsel in his amended postconviction petition. Defendant also clearly raised that claim in his appellant's brief, cited case authority that set forth the relevant standard for reviewing his claim on appeal (see *People v. Mack*, 167 Ill. 2d 525, 532 (1995)), and identified the basis of his appellate counsel's alleged ineffectiveness, *i.e.*, counsel's failure to raise the issue of trial counsel's alleged ineffectiveness in failing to offer to stipulate to the mere fact of defendant's prior felony conviction. Further, defendant's claim of appellate counsel's ineffectiveness largely depended on the merit of his underlying claim of trial counsel's alleged ineffectiveness. Defendant presented a fully developed and reasoned analysis as to that underlying claim. Accordingly, we decline to find forfeiture under the circumstances presented.

¶ 59        Regarding the merits of defendant's ineffective assistance claim, we find that even assuming deficient performance by his trial counsel in failing to stipulate to the mere fact of his prior felony conviction, defendant has failed to make a substantial showing of prejudice. Specifically, the record refutes defendant's contention that the evidence at trial was closely balanced regarding the identity of the shooter.

¶ 60        Defendant argues the evidence in his case was close because (1) Buchanan "did not know if [he] was the shooter," (2) the gunshot residue found on his clothing could have been

- 18 -

transferred when he was being restrained by Buchanan, and (3) he refuted the evidence of his alleged confession to the police. We note, however, that the evidence otherwise showed that after observing one of the suspects fire a gun in his direction, Buchanan stated he "kept [his] eyes on the person that fired the shot" and fired three rounds at the shooter. Buchanan observed the person fall before getting up and continuing to run. He believed the person fell because he was shot. Defendant was later found with an injury to his back. Although he initially attributed his injury to "glass," the treating emergency room doctor found it was more consistent with a gunshot wound. Bullet holes were also found in defendant's clothing. Tindall testified that she observed Buchanan shoot and saw a suspect fall after Buchanan fired his weapon. That same individual ran between some houses. A short time later, defendant was apprehended near where Tindall had observed the suspect running. The following morning, a revolver with one spent cartridge case in its cylinder was recovered from the same area.

¶ 61        Additionally, although defendant discounts the gunshot residue evidence and the evidence of his confession, we note that both are, ultimately, corroborative of other evidence that he was the shooter. Further, we note that gunshot residue was not simply found on defendant's clothing but on the cuff of the right sleeve of the "outer" sweatshirt he wore at the time of the alleged offenses. The State's expert acknowledged that he could not say that such evidence conclusively established that the person wearing the sweatshirt fired a gun. However, he did testify that the evidence was consistent with someone holding a weapon and firing it from their right hand. The expert's testimony also showed that he tested the cuffs of the sweatshirt because that was the location where gunshot residue was likely to be found if someone had fired a gun.

¶ 62        In challenging defendant's claim that the evidence was closely balanced, the State notes the Third District's findings from defendant's direct appeal regarding the sufficiency of the

evidence. We agree with defendant that whether the evidence was closely balanced presents a different question from whether the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt. We note, however, that in reaching its decision, the Third District found there was a "*substantial* amount of evidence supporting the jury's finding that [defendant] was the shooter." (Emphasis added.) *Jackson*, 3-02-0986, at 9. (2004) (unpublished order under Illinois Supreme Court Rule 23). We agree with this characterization and find that, even assuming trial counsel's performance was deficient when he failed to offer to stipulate to the mere fact of defendant's prior felony conviction, there is not a reasonable probability that the result of defendant's trial would have been different.

¶ 63    Because defendant cannot show prejudice, he cannot make a substantial showing that he received either ineffective assistance of trial counsel or appellate counsel. Given the circumstances presented, we find no error in the circuit court's second-stage dismissal of defendant's postconviction ineffective-assistance-of-counsel claims.

¶ 64                                C. Actual Innocence

¶ 65    On appeal, defendant further argues the circuit court erred in failing to advance his actual innocence claim for a third-stage evidentiary hearing. He contends the affidavits of Nelms and Fisher showed they could present new, noncumulative evidence that would result in his acquittal. Also, he contends that with respect to Nelms's affidavit, the Third District has already held that he is entitled to an evidentiary hearing. In response, the State argues the content of Nelms's and Fisher's affidavits were "cumulative of the defense presented at trial" and not of a conclusive character. It also contends that defendant misconstrues the Third District's prior order addressing Nelms's affidavit.

¶ 66    "To establish a claim of actual innocence, the supporting evidence must be

(1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered evidence is evidence that was discovered after trial and *** could not have [been] discovered earlier through the exercise of due diligence." *Id.* Evidence will be deemed material when "it is relevant and probative of the [defendant's] innocence" and noncumulative if it "adds to the information that the fact finder heard at trial." *Id.* Finally, evidence is of conclusive character if, "when considered along with the trial evidence, [it] would probably lead to a different result." *Id.*

¶ 67        "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.* "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. "The new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 68        Here, Nelms's affidavit stated that on the date of the alleged offenses, he observed Green wearing gloves and in possession of a gun. He provided a description of Green that was consistent with the description given for one of the fleeing suspects at trial. Nelms also averred that Green told him he accidentally fired the gun and got rid of it.

¶ 69        Fisher's affidavit stated he was parked in the area where the charged offenses occurred "[s]ometime in December of 2001" and witnessed events similar to what occurred at the time of the charged offenses. In particular, he asserted that he saw two men running from the back of a residence where he had intended to buy "weed." The men were being pursued by a police

officer, and Fisher recognized one of the men as "BD Paul." He asserted he "noticed the flash of the gunshot in Paul[']s hand." He also saw the officer shooting his weapon. Fisher later met defendant in prison, and because they were both from Peoria, they began to speak about people they knew. Defendant asked if Fisher knew "BD Paul." Fisher stated that he did and told defendant about the incident he witnessed.

¶ 70        Initially, we agree with the State that the Third District's prior appeal did not hold that defendant was entitled to a third-stage evidentiary hearing with respect to Nelms's affidavit. In that appeal, the reviewing court addressed the circuit court's first-stage, summary dismissal of defendant's initial postconviction petition, which involves a different standard of review than a second-stage dismissal. *People v. Jackson*, 3-05-0301 (2007) (unpublished order under Illinois Supreme Court Rule 23) (Holdridge, J., specially concurring; Schmidt, J., dissenting). Although some of the court's comments in its order suggested an evidentiary hearing was warranted, the court effectively only decided that defendant's initial postconviction petition stated the gist of a constitutional claim and warranted second-stage proceedings. The sole concurring justice wrote separately to emphasize this point. *Id.*

¶ 71        Nevertheless, the Third District's analysis of the issue in its prior order supports a finding of defendant's entitlement to a third-stage evidentiary hearing on his actual innocence claim. First, there is no dispute by the State that the affidavits from Nelms and Fisher constituted newly discovered evidence. The Third District explicitly made this finding with respect to Nelms's affidavit in defendant's prior appeal. *Id.* We find the same is true for Fisher's affidavit as he averred that he did not meet defendant or discuss what he had allegedly witnessed with defendant until September 2015, long after defendant was convicted and sentenced.

¶ 72        On appeal, the State notes that Nelms's affidavit relayed an out-of-court statement by Green. The Third District also previously rejected the State's challenge to Nelms's affidavit on the basis that it contained hearsay, finding such an argument premature at the first stage of postconviction proceedings. *Id.* We note any such challenge would still be premature at the second stage. "At the second stage, the well-pleaded facts in the petition and accompanying affidavits, including any affidavits containing hearsay, which do not conflict with the record, are taken as true when determining whether a defendant has made a substantial showing of his innocence." *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 117. It is at the third stage that a circuit court "must necessarily consider whether the new evidence would ultimately be admissible at a retrial." *Id.* Nelms's averments are not refuted by the record and must be taken as true. Thus, the admissibility of the hearsay statement in his affidavit should be resolved at the third stage of postconviction proceedings and not the second stage.

¶ 73        As indicated, the State explicitly challenges both affidavits on the bases that they are cumulative of the defense theory at trial and not of conclusive character. Again, the Third District rejected an argument that Nelms's affidavit was cumulative, finding, instead that it was corroborative. *Jackson*, 3-05-0301 (unpublished order under Illinois Supreme Court Rule 23). We agree and find the same is true of Fisher's affidavit.

¶ 74        As noted, evidence is noncumulative if it "adds to the information that the fact finder heard at trial." *Robinson*, 2020 IL 123849, ¶ 47. In this instance, both affidavits were probative of who possessed and fired a gun at the time of the alleged offenses. Nelms's affidavit contained statements that Green was observed with a gun on the date of the offenses and admitted firing a gun during the encounter with the police. Fisher's affidavit suggested someone other than defendant fired a gun during the incident. Although the affidavits, like the defense's theory at trial,

identified someone other than defendant as the shooter, their content would serve to corroborate the defense's version of events and conflict with the State's evidence that defendant was the shooter, thereby adding to the information presented to the jury. See *People v. Sparks*, 393 Ill. App. 3d 878, 886 (2009) (rejecting an argument that testimony from an uninvolved witness that supported the defendant's testimony was cumulative).

¶ 75 Finally, we also find that defendant has made a substantial showing that his new evidence was of a conclusive character. Notably, in its prior order, the Third District stated that the trial proceedings in defendant's case produced "some uncertainty" as to the identity of the shooter and it found that "should Nelms testify, an evidentiary hearing on defendant's postconviction petition may result in a finding of actual innocence." *Jackson*, 3-05-0301, at 13 (unpublished order under Illinois Supreme Court Rule 23).

¶ 76 As stated, evidence is of a conclusive character if, "when considered along with the trial evidence, [it] would probably lead to a different result." *Robinson*, 2020 IL 123849, ¶ 47. We reiterate that the second stage of postconviction proceedings does not require fact finding or credibility determinations and that the defendant's postconviction allegations are taken as true unless they are refuted by the record. *Domagala*, 2013 IL 113688, ¶ 35. "[T]he 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle [the] petitioner to relief." (Emphasis omitted.) *Id.* ¶ 35.

¶ 77 In this instance, the affidavits of Nelms and Fisher were not refuted by the record and must be taken as true. Additionally, they contained support for the defense theory that someone other than defendant possessed and fired a gun during the incident at issue. Although we find the

State presented strong and compelling evidence of defendant's guilt at trial, defendant's newly discovered evidence, if proven and found credible following an evidentiary hearing, would tend to place the trial evidence in a new light and undermine confidence in the verdict. Accordingly, we find the circuit court erred in its second-stage dismissal of defendant's actual innocence claim and remand for a third-stage evidentiary hearing.

¶ 78                                III. CONCLUSION

¶ 79            For the reasons stated, we affirm the circuit court's judgment in part, reverse in part, and remand with directions that the circuit court conduct an evidentiary hearing on defendant's actual innocence claim.

¶ 80            Affirmed in part and reversed in part; cause remanded.